**VISA INTERNATIONAL SERVICE ASSOCIATION, a Delaware corporation, Plaintiff,**

v.

**VISA HOTEL GROUP, INC., a New York corporation; the Horn and Hardart Company, a New York corporation; Horn and Hardart Nevada, Inc., a Nevada corporation; and Royal Center, Inc., d/b/a Royal Americana Hotel & Casino, Defendants.**

**Civ. No. LV 80-249 RDF.**

United States District Court, D. Nevada.

April 8, 1983.

Limbach, Limbach & Sutton, John P. Sutton, Malcolm B. Wittenberg, San Francisco, Cal., Seiler & Quirk, Edward J. Quirk, Las Vegas, Nev., for plaintiff.

Lieberman, Rudolph & Nowak, Arthur M. Lieberman, New York City, Heaton & Wright by Monte Stewart, Las Vegas, Nev., for defendants.

## OPINION

ROGER D. FOLEY, Senior District Judge.

I. *Statement of Facts*

This action is for trademark infringement, false designation of origin and unfair competition under federal law, and trademark infringement and unfair competition under Nevada law.

Plaintiff, Visa International Service Association, is a Delaware corporation having its principal place of business at 600 Montgomery Street, San Francisco, California.

Defendant, Visa Hotel Group, Inc. (hereinafter "Hotel Group"), is a New York corporation having its principal place of business at 237 Madison Avenue, New York, New York.

Also named as defendants are the Horn & Hardart Company, Horn & Hardart Nevada, Inc., and Royal Center, Inc.

Horn & Hardart is a Nevada corporation having its principal place of business at 305 East Carson Avenue, Las Vegas, Nevada. The Royal Center, Inc., is a wholly-owned subsidiary of Horn & Hardart and is a Nevada corporation. The Royal Americana Hotel and Casino, formerly operated under the name Royal Inn Hotel and Casino, is owned and operated by Royal Center, Inc., and is located at 305 Convention Center Drive, Las Vegas, Nevada.

Trial of this matter took place before this Court March 23, 24 and 26, 1982. Following briefing, the case was submitted for decision July 13, 1982.

Plaintiff is the successor in ownership of the entire right, title and interest in the mark "VISA" and the valid uncancelled federal service mark registration therefor with the United States Patent & Trademark Office:

1. No. 980,571   For banking services. Registered March 12, 1974.

2. No. 1,065,272   For newsletters dealing with bank cards. Registered May 10, 1977.

3. No. 1,071,114   Financial services for card holders. Registered August 9, 1977.

4. No. 1,152,655   Travelers cheques. Registered April 28, 1981.

Plaintiff first used the mark "VISA" for banking services on April 3, 1972 (980,571). Plaintiff first used "VISA" for newsletters dealing with bank cards on February 9, 1976 (1,065,272). On July 26, 1976, plaintiff first used "VISA" for financial services involving the use of plastic cards by card holders in merchant and banking establishments for payment to merchants, loans to card holders or transfer of card holder funds (1,071,114). On November 1, 1979, plaintiff first used "VISA" for travelers cheque services (1,152,655).

Plaintiff also owns a Nevada state trademark registration.

Plaintiff is an international membership organization comprised of approximately 12,500 financial institutions which issue more than 90 million bank cards bearing plaintiff's "VISA" service mark. Plaintiff's member institutions contract with more than 3 million merchants in over 140 countries who accept the VISA card. Travelers cheques bearing the "VISA" mark issued by plaintiff's member institutions are accepted in 140 countries.

Plaintiff's "VISA" mark has been extensively used, advertised and promoted throughout the United States and the world in association with plaintiff and its financial services. Plaintiff has built up extensive good will in connection with these services offered to the public around the world under the "VISA" mark. By reason of plaintiff's use, advertising and promotion of the "VISA" mark on bank cards and travelers cheques, the mark "VISA" has come to be recognized as identifying plaintiff and its financial services. These financial services are widely used in the worldwide travel, entertainment and recreational fields. The VISA bank card is advertised in the travel industry and, in particular, for paying for hotel and travel expenses.

The defendants do not contest the validity of plaintiff's "VISA" trademark for the goods and services covered by the aforecited registrations.

Visa Hotel Group, Inc., is a sales and marketing organization which was formed to promote hotels which were commonly owned by Mark Fleischman and the Fleischman family. Since the formation of Hotel Group in 1979, the company has marketed John Newcombe's Vacation Resort in Orlando, Florida, the Virgin Isle Hotel on St. Thomas, Virgin Islands, and the Executive Hotel in New York City, all commonly owned, in part, by the Fleischman family, as well as Horn & Hardart's Royal Americana Hotel and Casino in Las Vegas.

Defendant Hotel Group first used "VISA HOTEL GROUP" on July 18, 1979. It has continued to use "VISA HOTEL GROUP" as its trademark in marketing the hotels.

On July 23, 1979, Hotel Group filed an application to federally register "VISA" as its trademark for identifying a member hotel with the United States Patent & Trademark Office. That application was subse-

quently abandoned. On January 22, 1980, Hotel Group formally filed its articles of incorporation in New York.

In the fall of 1980, Hotel Group ceased its representation of the Royal Americana due to a monetary dispute between these defendants. Hotel Group has continued to represent the other named hotels.

Hotel Group Chairman Mark Fleischman chose the name "VISA Hotel Group" with knowledge of plaintiff's "VISA" trademark.

Although Hotel Group had its attorneys conduct a trademark search which revealed plaintiff's trademark registrations, Fleischman allegedly chose the name "VISA", believing there would be no problem with the prior registrations because the plaintiff did not have a specific registration for "VISA Hotels."

All of Hotel Group's member hotels accept the VISA bank card for payment of their hotel services.

Defendant Hotel Group has been using the name "VISA Hotel Group" in dealing with the travel trade industry all over the world, including airline and travel agencies.

Defendant Hotel Group advertises in trade journals such as Travel Weekly, Travel Age East, Travel Age West, Travel Agent and Hotel and Travel Index, which are circulated to subscribing travel agents throughout the United States. Defendant Hotel Group attends hotel and travel conventions and shows and makes direct calls on behalf of its member hotels to tour operators, wholesale travel agents, charter groups, flying clubs and other organizations throughout the world which typically refer business to hotels. Hotel Group also represents its member hotels at trade shows.

Hotel Group does not act to directly accept bookings at the represented hotels and does not direct its activities to the general public or to individual consumers.

Hotel Group adopted and used the word "VISA" for the purpose of promoting its association of hotels, each of which does business as "A VISA Hotel." These words are stamped or printed on brochures disseminated by Hotel Group in promoting its various hotel members.

Defendant Hotel Group solicited airlines, including Eastern, TWA, Republic, Braniff, American, United, Delta, Western and Air California to promote the inclusion of hotels represented by the Hotel Group in travel packages offered by the airlines.

All these airlines accepted the VISA bank card in payment of airline services, and plaintiff alleges it has advertised in the in-flight magazines of several of the named airlines.

All of Hotel Group's marketing efforts have been under "VISA HOTEL GROUP," or "A VISA Hotel," including the marketing efforts for the Royal Americana Hotel and Casino during the time it was represented by Hotel Group.

Hotel Group represents hotels at trade shows where the "VISA HOTEL GROUP" sign is prominently displayed. One series of trade shows in which Hotel Group has participated since the fall of 1979 appeared in Boston, Massachusetts, and other cities about ten times each spring and ten shows each fall. At these trade shows, Hotel Group disseminated brochures which were stamped or printed "A VISA Hotel."

Brochures having "A VISA Hotel" printed or stamped thereon were distributed to the travel trade on behalf of hotels in New York City, Orlando, Florida, and St. Thomas, Virgin Islands. Similar brochures were distributed for the Royal Inn Hotel and Casino prior to the change of its name to the Royal Americana Hotel and Casino.

In December 1979, Hotel Group received a letter from plaintiff objecting to its use of the word "Visa." Defendant Hotel Group never responded to plaintiff's request to stop using the word. The present action was filed eight months later on August 5, 1980.

A motion for a preliminary injunction was filed with this Court by the plaintiff on March 12, 1981. That motion was consolidated with the trial on the merits due to insufficient evidence.

Plaintiff is seeking this Court's decree that the defendants have infringed plain-

tiff's "VISA" service marks. Plaintiff is thus seeking to permanently enjoin defendants' use of "VISA," either standing alone or as part of defendants' "VISA HOTEL GROUP" tradename. Plaintiff is seeking to permanently enjoin defendants' use of "VISA" as a means of identifying any hotel as "A VISA Hotel" or as a corporate name, as in "VISA HOTEL GROUP."

## II. *Jurisdiction and Claims*

Plaintiff brings suit for Federal Trademark Infringement pursuant to Title 15 U.S.C. § 1114, False Designation of Origin pursuant to Title 15 U.S.C. § 1125, Nevada Trademark Infringement pursuant to NRS 600.420, and the common law theory of unfair competition. Jurisdiction in this court is vested pursuant to Title 15 U.S.C. § 1121 and Title 28 U.S.C. § 1338(a) and (b). Venue is proper in the federal district court where all defendants reside and where acts of trademark infringement occur under Title 28 U.S.C. § 1391(b) and (c). Jurisdiction over the state and common law claims is provided for pursuant to Title 28 U.S.C. § 1338(b). And jurisdiction for injunctive relief against infringement of a registered mark is provided pursuant to Title 15 U.S.C. § 1116 and NRS 600.420 and 600.430.

## III. *Issues*

### A. *Nevada Trademark Infringement*

NRS 600.420 provides a civil remedy against those who infringe upon a trademark registered in Nevada.

NRS 600.420 and 600.430 read as follows:

600.420 Infringement upon registered mark. Any person:

1. Who uses, without the consent of the registrant, any reproduction, counterfeit, copy or colorable imitation of a mark registered in this state in connection with the sale, offering for sale or advertising of any goods or services, which use is likely to cause confusion or mistake or result in deception as to the source of origin of such goods or services; or

2. Who reproduces, counterfeits, copies or colorably imitates any mark registered in this state and applies or causes to apply that reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in conjunction with the sale or other distribution in this state of goods or services, is liable in a civil action by the owner of the registered mark for any or all of the remedies provided in NRS 600.430, except that the owner of the mark is not entitled to recover profits or damages under subsection 2 unless the act or acts were committed with knowledge that the reproduction, counterfeit, copy or imitation of the mark was intended to be used to cause confusion, mistake or deception.

600.430 Civil remedies.

1. Any owner of a mark registered in this state may proceed by suit to enjoin the manufacture, use, display or sale of counterfeits or imitations of it and a court of competent jurisdiction may grant injunctions to restrain such manufacture, use, display or sale as it deems just and reasonable under the circumstances, and may require the defendants to pay to the owner all profits derived from his wrongful acts and all damages suffered by reason of these acts. The court may also order that any counterfeits or imitations in the possession or control of any defendant be delivered for destruction to an officer of the court or to the complainant.

2. The enumeration of any right or remedy in this section does not affect a registrant's right to prosecute under any penal law of this state.

Plaintiff's Exhibit P–64 is a copy of a State of Nevada Certificate of Trademark, filed February 14, 1978, and duly signed by Nevada Secretary of State William D. Swackhamer.

Plaintiff's witness Dennis C. Davis, former Royal Americana Hotel Manager, testified at the trial that he began work at the Las Vegas hotel on August 27, 1979 (Tr. p. 124, l. 25—p. 125, ll. 1–4). Davis testified that in January 1980 a brochure was printed to advertise the hotel which contained

the words "A VISA Hotel" (Tr. p. 131, ll. 2–25; p. 132, ll. 1–8). He testified the brochure was available to the general public at the hotel's front desk (Tr. p. 135, ll. 16–22).

Therefore, plaintiff's VISA mark was on file in Nevada before defendants began using "A VISA Hotel" on brochures for their Las Vegas hotel without plaintiff's consent.

Whether such use by defendants was "likely to cause confusion or mistake or result in deception as to the source of origin of such goods or services" will be discussed regarding the alleged federal law violations.

### B. Federal Trademark Infringement, False Designation of Origin and Unfair Competition

#### 1. Factors Relevant to Likelihood of Confusion

The Ninth Circuit has held that the tests for Federal Trademark Infringement under Title 15 U.S.C. § 1114, False Designation of Origin under Title 15 U.S.C. § 1125 and unfair competition involving trademarks, are the same. *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir.1980); *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979). The ultimate test is whether the public is likely to be deceived or confused by the similarity in the marks. *International Order of Job's Daughters v. Lindeburg & Co.*, supra at 917.

The Ninth Circuit has defined the elements to be considered in deciding whether there is a "likelihood of confusion." In *J.B. Williams & Co., Inc. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 191 (9th Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976), the Court stated:

" ... [T]he court must consider numerous factors, including inter alia the strength or weakness of the marks, similarity in appearance, sound and meaning, the class of goods in question, the marketing channels, evidence of actual confusion, and evidence of the intention of defendant in selecting and using the alleged infringing name."

In a later case, the Ninth Circuit listed eight factors relevant in determining whether confusion between related goods is likely:

"1. strength of the mark;

2. proximity of the goods;

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. type of goods and the degree of care likely to be exercised by the purchaser;

7. defendant's intent in selecting the mark; and

8. likelihood of expansion of the product lines."

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–349 (9th Cir.1979). See also *Alpha Industries v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440 (9th Cir.1980); *Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th Cir.1981), reh. denied, July 15, 1981.

This Court will discuss each factor serially.

#### (a) Strength of the Mark

A "trademark" has been generally defined as "any word, name, symbol or device adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." *Bass Buster, Inc. v. Gapen Mfg. Co., Inc.*, 420 F.Supp. 144, 156 (W.D. Mo., W.D.1976).

The basic purpose of a trademark is to identify the source of goods to consumers. A trademark becomes invalid when it primarily denotes the product, not the producer. "It is the source-denoting function which trademark laws protect, and nothing more." *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 301 (9th Cir.1979), U.S. cert. denied, —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468.

"One competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods." *Anti-Monopoly*, supra at 301, quoting *Bada Co. v. Montgom-*

ery Ward & Co., 426 F.2d 8, 11 (9th Cir. 1970), cert. denied, 400 U.S. 916, 91 S.Ct. 174, 27 L.Ed.2d 155.

In determining the strength of a mark, there are three categories: (1) arbitrary or fanciful; (2) suggestive; and (3) descriptive.

In AMF Inc. v. Sleekcraft Boats, supra at 349, the Ninth Circuit stated the following test:

"A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses. See, e.g., National Lead Co. v. Wolfe, 223 F.2d 195, 199 (CA 9), cert. denied, 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955) (Dutch Boy not used geographically or descriptively, but in a 'fictitious, arbitrary and fanciful manner'). A descriptive mark tells something about the product; it will be protected only when secondary meaning is shown.[12] See Miss Universe, Inc. v. Patricelli, 408 F.2d 506 (CA 2 1969); cf. Hesmer Foods, Inc. v. Campbell Soup Co., 346 F.2d 356 (CA 7), cert. denied, 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965) (barbecue beans used as a description, not a trademark). In between lie suggestive marks which subtly connote something about the products. Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning. Watkins Products, Inc. v. Sunway Fruit Products, Inc., 311 F.2d 496 (CA 7 1962)."

The word "visa" is a word of French derivation meaning, "An official authorization appended to a passport, permitting entry into and travel within a particular country or region ... To endorse or ratify (a passport)." American Heritage Dictionary of the English Language (1981). In using the word "VISA" in the context of financial services, the word is either suggestive or descriptive about the use and function of the "VISA" bank card and other financial services. The word is not used in a "fictitious, arbitrary and fanciful manner." But

see Visa International Service Association and Bankcard Holders of America, CV–80–3694 (N.D.Cal. Feb. 26, 1981). (Court held that the word "VISA" and the "Band Design" was a strong mark.)

The AMF Court went on to distinguish between descriptive and suggestive marks:

"Although the distinction between descriptive and suggestive marks may be inarticulable, several criteria offer guidance. See generally McCarthy, supra, at §§ 11:21–11:22. The primary criterion is 'the imaginativeness involved in the suggestion,' Restatement of Torts § 721, Comment a (1938): that is, how immediate and direct is the thought process from the mark to the particular product.... A secondary criterion is whether granting the trademark owner a limited monopoly will in fact inhibit legitimate use of the mark by other sellers.... Another criterion is whether the mark is actually viewed by the public as an indication of the product's origin or as a self-serving description of it. See Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794 (CA 9 1970)."

Supra at 349.

Considering the "primary criterion" first, that is, "how immediate and direct is the thought process from the mark to the particular product," this Court finds that from the word "visa," one does not readily conjure up the image of plaintiff's plastic card or financial services except when considering plaintiff's advertising efforts to make that connection in the minds of the public.

The first secondary criterion is whether granting the trademark owner a limited monopoly will inhibit legitimate use of the mark by other sellers. Here, evidence was introduced at the trial to indicate that others have used, or desired to use, "visa" in describing their goods. This Court has no intention of precluding use of the word "visa" by others whose goods or services are unrelated to those of plaintiff.

The last criterion is whether the mark is viewed by the public as an indication of the product's origin or as a self-serving descrip-

tion of it. This Court finds that the word "visa" is not in fact descriptive of the services offered by plaintiff and does indicate the product's origin.

■ Applying the afore-cited tests, this Court holds that the mark "VISA" is a suggestive, and thus comparatively weak, mark. A suggestive mark may, however, be protected without proof of secondary meaning.

■ Following the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats,* supra at 350, which held that "Slickcraft" was a suggestive mark when applied to boats, this Court holds that only if the marks are quite similar and the goods closely related, will infringement be found.

### (b) *Proximity of the Goods*

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *AMF,* supra at 350. See also *Stork Restaurant, Inc. v. Sahati,* 166 F.2d 348, 356 (9th Cir.1948).

In fact, related goods have been defined as those "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF,* supra at 348, n. 10; *Standard Brands, Inc. v. Smidler,* 151 F.2d 34, 37 (2d Cir.1945).

■ The more likely the public is to make an association between the producers of related goods, the less similarity in the marks is needed for a finding of likelihood of confusion. Thus, less similarity between the marks will suffice when the goods are complementary. *AMF,* supra at 350.

As stated, the plaintiff's business is the offering of financial services to the public, including bank cards and travelers cheques for use among others in the travel and entertainment industry. Defendants are in the business of marketing specific hotels, primarily to wholesale buyers, and only indirectly to the general public.

The defendants charge there is no likelihood of confusion between the use of the mark "VISA" by plaintiff on financial services and the use of the mark "VISA" by defendants to designate its member hotels.

The defendants maintain that the financial services provided by plaintiff and the hotel services provided by defendants are different, nonrelated and noncompetitive. Although these financial and hotel services are different and noncompetitive, they exist as complementary products in the same general industry, i.e., the travel and entertainment industry, and they are definitely related. Consumers may be confused as to the source of plaintiff's and defendants' products for the following reasons:

1.  VISA bank cards and travelers cheques are commonly used while traveling, a fact heavily emphasized by the plaintiff in its advertising of VISA;

2.  The main consumer market for hotels is travelers;

3.  Travel agents give their clients such information as which hotels accept which credit cards;

4.  Holders of VISA cards may assume that "VISA HOTEL GROUP" hotels cater to VISA card holders;

5.  VISA card holders who have come to expect a certain standard of quality in dealing with the credit card company may assume a "VISA HOTEL GROUP" hotel will exhibit the same standard of quality;

6.  Defendants' hotels accept the VISA card and travelers cheques.

In addition, even if an alleged infringer's goods are of high quality, this is no defense:

"The hallmark of a trademark owner's interest in preventing use of his mark on related goods is the threat such use poses to the reputation of his own goods ... When the alleged infringer's goods are of equal quality, there is little harm to the reputation earned by the trademarked goods. Yet this is no defense, for present quality is no assurance of continued quality." *AMF,* supra at 353.

### (c) Similarity of the Marks

The similarity of any competing marks "is of substantial importance." *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 351 (9th Cir.1980).

The *AMF* Court, supra at 350, stated that marks may be similar in appearance, yet not likely to cause confusion as to their source, particularly when all the factors are considered.

However, in discussing the marks "Sentol" and "Sen-Trol," the United States Court of Customs and Patent Appeals stated, "Here we have a set of marks so similar that any distinction is likely to be obscured in the pronunciation. In such a case, the respective goods must be widely dissimilar, and the purchasers extremely discriminating, before it can be said that confusion in trade is unlikely." *Russell Chemical Co. v. Wyandotte Chemicals Corp.,* 337 F.2d 660, 662, 52 Cust. & Pat.App. 807 (1964).

Three tests are utilized to determine the similarity of marks: sight, sound and meaning. *AMF,* supra at 351. See *Chesebrough-Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 397 (9th Cir.1982), reh. denied, March 18, 1982. (Court discussed difference in sound, number of syllables and meaning of "Macho" and "Match".)

Similarity of the marks must be considered in light of the manner in which they are encountered in the marketplace. *Alpha Industries v. Alpha Steel, Etc.,* 616 F.2d 440, 444 (9th Cir.1980). "Although similarity is measured by the marks as entities, similarities weigh more heavily than differences." *AMF,* supra at 351.

The plaintiff's mark contains the word "VISA" with all capital letters and a blue, white and orange band design. The defendants' mark contains the words "A VISA Hotel." The word "VISA" is also capitalized, but the band design is not used.

Plaintiff's word mark and the key word in defendants' mark are identical: VISA. Of the three factors to be considered, sight, sound and meaning, the main differences between the marks are in their visual appearances.

The tricolor band which accompanies plaintiff's mark does negate the visual similarity of the marks to some degree. This Court finds, however, that the main identification of the producer of goods comes from the word "VISA." On viewing the marks, consumers are much more likely to remember the word "VISA," to which meaning is attached, than a seemingly meaningless band of three colors. To reinforce the visual similarity, the word "VISA" is capitalized in each mark. The words "A" and "Hotel" are merely descriptive, as are the words "Hotel Group" in defendants' other usage, and they cannot receive protection in themselves.

"Sound is also important because reputation is often conveyed word-of-mouth." *AMF,* supra at 351. Here, the marks are virtually identical. The band design does not affect the sound of the marks and, as stated earlier, the other words are merely descriptive. The word "VISA" is plaintiff's only mark when examined orally, and "VISA" is the part of defendants' mark which will be remembered by the listener.

The final criterion is meaning. "Closeness in meaning can itself substantiate a claim of similarity of trademarks." *AMF,* supra at 352. The meaning of "VISA," used in the context of plaintiff's mark and in the context of defendants' mark, is identical. Plaintiff's band of colors, and defendants' lack of that logo, does not alter the meaning of "VISA," nor do the other words used by defendants ("A", "Hotel" and "Hotel Group"). In fact, plaintiff may argue that the meaning of "VISA" is the association in the minds of consumers between plaintiff and its bank cards, travelers cheques and other financial services. This will be discussed further regarding defendants' intent in selecting the mark.

This Court holds that the marks "VISA," "A VISA Hotel" and "VISA HOTEL GROUP" are quite similar on all three levels, sight, sound and meaning.

### (d) Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof

that future confusion is likely ... Proving actual confusion is difficult, however, ... and the courts have often discounted such evidence because it was unclear or insubstantial." *AMF,* supra at 352 (citations omitted).

The plaintiff has presented no evidence of actual confusion of the public. Although a survey was conducted in the Boston area reputedly showing that 76.9% of the almost 400 persons interviewed thought a "VISA HOTEL GROUP" hotel was related to the VISA bank card (see plaintiff's Exhibit 42), this is evidence of potential, not actual, confusion.

■ However, neither actual confusion nor intent are necessary to a finding of likelihood of confusion under these statutes. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1201 (9th Cir.1979). See also *Golden Door, Inc. v. Odisho,* supra, 646 F.2d at 351.

"Because of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive ... Consequently, this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available." *AMF,* supra at 353 (citation omitted).

(e) *Marketing Channels Used*

Convergent marketing channels increase the likelihood of confusion. *AMF,* supra at 353.

Plaintiff has advertised the VISA bank card and other financial services to both the general public and thousands of merchants around the world and has focused its advertising efforts on promoting the use of VISA while traveling.

Visa International Marketing Director Robert M. Sanders testified for the plaintiff at the trial:

"Our research told us that even people who didn't ever take trips to foreign destinations themselves felt that they had a better card if, in fact, they had a card that was accepted worldwide... Well,

virtually, all of our advertising thrust is aimed at travel, partly for the reason I just stated, that the people who don't travel think they have a better product if they have a card that will travel. But beyond that, we know that, for example, people who stayed six or more times in a hotel in 1981, there are about 11 million people so identified by our research sources. Nearly half of those people, a little over five million of them, have a VISA card. So, travel represents a considerable volume for us now, and an enormous potential for us in the future." (Tr. p. 81, ll. 23–25; p. 82, ll. 5–14.)

In fact, some of plaintiff's advertising spots called the VISA card a "travel card."

Defendants maintain that, "To the extent that Plaintiff's VISA services are touted as travel aids, the public is not likely to think that Plaintiff is in the business of providing travel services." However, if plaintiff's surveys are to be considered, this claim is wrong.

Advertising dollars spent by the parties is only one factor to be considered:

"Plaintiff relies heavily on its long and substantial advertising expenditures vis-a-vis the minimal advertising by defendant as a factor in its favor. While such relative advertising expenditure is an additional factor to be considered, *Sears, Roebuck and Co. v. Allstates Trailer Rental, Inc.,* 188 F.Supp. 170, 177 (D.Md. 1960), it is not dispositive, for a 'large expenditure of money does not in itself create legally protectable rights.' *Smith v. Chanel, Inc.,* 402 F.2d 562, 568 (9th Cir.1968)."

*Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 800 (9th Cir.1970).

The defendants maintain that they market their hotels to wholesale purchasers of hotel rooms such as travel agents, tour operators and convention promoters. Defendants also use promotional brochures and advertising in travel magazines to reach the general public.

During the trial, travel agent Pricilla Mellen testified for the plaintiff that she

obtained brochures stamped with the words "VISA HOTEL GROUP" at the Henry Davis Trade Show in Boston, Massachusetts, on October 26, 1981. Mellen testified she visited all the booths at the show, collecting brochures. She stated that generally, when brochures were collected at travel shows, they were then displayed in the travel agency's front office for the general public to pick up. She did not specifically testify, however, that the brochures she obtained on October 26, 1981, stamped "VISA HOTEL GROUP" were given to the general public. (Tr. pp. 151–157.)

Also for the plaintiff, former Royal Americana Hotel Manager Dennis C. Davis testified that after defendant Horn & Hardart purchased the Royal Inn Hotel and Casino, a new brochure was printed which included the words "A VISA Hotel." Davis testified that the Royal Inn did not use the words "A VISA Hotel" on its brochures prior to the association of Horn & Hardart. Davis testified that the brochures containing the words "A VISA Hotel" were sent to travel agents, sent to airlines to give out at ticket desks and handed out at trade shows. Davis also testified the brochures were available at the Royal Inn's front desk (Tr. pp. 131–135):

"Q And was the brochure, Exhibit 21, on display at the hotel?

"A Yes, it was kept at the front desk. And anyone who wished to have a brochure of the hotel could pick it up right there.

"Q It was on display, was it?

"A Yes."

(Tr. p. 135, ll. 16–22.)

Horn & Hardart Vice-Chairman Donald Schupak testified for the defendants that some Royal Inn brochures had the words "VISA HOTEL GROUP" printed on them (Tr. p. 406, ll. 3–9).

Considering the above evidence, this Court finds that defendants did market their wares to the general public to a substantial degree and that the marketing channels used by the plaintiff and by the defendants did converge.

(f) *Type of Goods and Purchaser Care*

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution... Although the wholly indifferent may be excluded, ... the standard includes the ignorant and the credulous... When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely... Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."

*AMF,* supra at 353 (citations omitted). "The care exercised by the typical purchaser, though it might virtually eliminate mistaken purchases, does not guarantee that confusion as to association or sponsorship is unlikely." Supra at 353.

In *Alpha Industries v. Alpha Steel, Etc.,* 616 F.2d 440 (9th Cir.1980), the Court of Appeals affirmed a district court ruling that there was no likelihood of confusion as to the identity or association between plaintiff and defendant due to their common use of the name and mark "Alpha."

The Court of Appeals held that one factor to be considered was purchaser care:

"Moreover, one of the circumstances surrounding the purchase of these goods is the fact that the purchasers are knowledgeable, sophisticated specialists in their areas."

Supra at 444.

In *Russell Chemical Co.,* supra, 337 F.2d at 632, the Court held that when the plaintiff's and defendant's marks are "so similar that any distinction is likely to be obscured in the pronunciation ... the respective goods must be widely dissimilar, and the purchasers extremely discriminating, before it can be said that confusion in trade is unlikely."

In the instant case, plaintiff is a provider of financial services, including its VISA card which may be used to pay travel expenses. The defendants market a group of hotels. Consumers choose to utilize plain-

tiff's services because of the reputation of the VISA name and the accessibility and convenience of the credit card service. Consumers also often choose hotels by reputation or because they have been favorably impressed in the past while staying in a hotel belonging to a certain chain. Seeing a familiar name such as VISA, a name which VISA card holders and other consumers may believe can be trusted, could influence them to choose a "VISA" hotel. Therefore, confusion may be likely even if consumers exercise a relatively high degree of care in choosing a hotel.

### (g) Defendants' Intent in Selecting Mark

"If the latecomer adopts the name or mark deliberately to capitalize on the prior user's trade name and thus cause and benefit from confusion, that is an important factor in favor of finding the likelihood of confusion."

*Alpha Industries,* supra, 616 F.2d at 446. See also *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 157–158 (9th Cir.1963), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053.

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived..."

*AMF,* supra at 354 (citations omitted).

Hotel Group Chairman Mark Fleischmann chose the name "VISA HOTEL GROUP" with knowledge of plaintiff's VISA trademark.

Although Hotel Group had its attorneys conduct a trademark search which revealed plaintiff's trademark registrations, Fleischmann allegedly chose the name "VISA" in good faith, believing there would be no problem with the prior registrations because the plaintiff did not have a specific registration for "VISA Hotels."

After being asked how the name "VISA" was chosen by the defendants, Horn & Hardart Vice-Chairman Donald Schupak testified at trial:

"In my discussion with the SERVICO Chairman, whose name is Arthur Meyer, we were discussing names and we were discussing our philosophies about names, and felt the name should be short, familiar and related to the industry, and should be related to the message that we want to get across to the prospective clientele, about the quality of the service or the goods that you have to offer.

"For example, he had just given me an example of a name that he was going to use, or attempt to use, for a chain of new airport hotels that his company was contemplating developing. He told me he was going to use the name Royce. I said, 'You know, that sounds very regal, but it occurs to me ...' this was not a direct response, I am not paraphrasing my conversation, but the concept of acceptability was a stamp of approval connected with travel. With the word VISA, it could be very traumatic because it sounds like acceptable, approved, travel, I like that.

"He said, 'I like that too.'

"That was the conversation, that was the genesis of the name." (Tr. p. 341, ll. 4–23.)

Schupak testified he wanted to select a mark "related to the message that we want to get across to the prospective clientele, about the quality of the service or the goods that you have to offer."

It is difficult for this Court to understand how consumers would glean an impression of quality from the dictionary word "visa." Although familiar to most people, the word is not common in everyday conversation. If consumers feel the word "VISA" signifies quality of services or goods, that impression must logically come from their familiarity with the VISA bank card, of which more than 90 million have been issued.

The following quotation is pertinent here: "But when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter

has indicated that he expects confusion and resultant profit."
*Fleischmann Distilling Corp.,* supra, 314 F.2d at 158.

(h) *Likelihood of Expansion of Product Lines*

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. Restatement of Torts § 731(b) and Comment c." *AMF,* supra at 354.

In the instant case, there is no evidence that either plaintiff or defendants plan on expanding their businesses to enter into the other's specific market. Therefore, likelihood of expansion is not a factor in this case.

## IV. *Conclusion*

Pursuant to the above analysis, this Court finds that defendants' use of plaintiff's mark is likely to cause confusion in the minds of consumers as to product origin.

This Court finds that the mark VISA, when utilized in the manner that plaintiff has done, is a suggestive mark, one which will be protected only if the marks are similar and the goods related. *AMF,* supra at 350. This Court finds the marks in issue to be similar and the goods to be sufficiently closely related to invoke protection of the trademark laws.

The Lanham Act, Title 15 U.S.C. § 1114(1)(a), provides that it is unlawful to use another's registered trademark when "such use is likely to cause confusion, or to cause mistake, or to deceive." Section 1116 of the Lanham Act authorizes injunctions to restrain violations of the rights of the owner of registered marks.

For purposes of injunctive relief under the Lanham Act, only a likelihood of confusion need be shown. *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288 (S.D.N.Y.1972).

This Court is aware that plaintiff has been over-zealous at times in attempting to protect what it sees as the enforcement of its trademark rights. This Court does not condone such activities. There is little doubt that if the defendants' product had been VISA dog food or VISA ice cream or VISA umbrellas, plaintiff would have no cause of action. However, those cases are not now before this Court.

This Court wishes to make clear that the effect of this ruling is not to remove the word "visa" from the English language save its use by the plaintiff. The finding is merely that "VISA" is a suggestive mark which has been infringed under this specific set of circumstances.

For the above-stated reasons, this Court finds that a disclaimer is not sufficient and defendants must be enjoined from future use of the word "VISA" regarding hotel services.

This opinion constitutes this Court's findings of fact and conclusions of law. Plaintiff's counsel shall prepare and forthwith submit a proper form of judgment and injunction by which the defendants Visa Hotel Group, Inc., the Horn & Hardart Company, Horn & Hardart Nevada, Inc., and Royal Center, Inc., will be permanently enjoined from using the word "visa" in promoting their hotel businesses, in violation of Title 15 U.S.C. § 1114, Federal Trademark Infringement; Title 15 U.S.C. § 1125, False Designation of Origin; NRS 600.420, Nevada Trademark Infringement, and the common law theory of unfair competition. Defendant Visa Hotel Group, Inc., also will hereby be permanently enjoined from using the word "visa" in its corporate name, Visa Hotel Group, Inc.